Charles D. Prutzman v. Commissioner.
Prutzman v. Commissioner
Docket No. 40565.
United States Tax Court
1953 Tax Ct. Memo LEXIS 28; 12 T.C.M. (CCH) 1401; T.C.M. (RIA) 53400; December 10, 1953
*28 Held: Evidence insufficient to establish that petitioner became a creditor as a result of his advances through the agency of his brother to two new corporations over a three-year period and that such advances constituted loans. Richard P. Jackson, Esq., 70 Pine Street, New York, N. Y., for the petitioner. Francis J. Butler, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income tax for the taxable year 1941 in the amount of $7,450.31. The deficiency was based on the disallowance, in part, of certain deductions, of which only one, in the amount of $15,000, is presently in dispute. The first and principal issue here is whether the sum of $15,000 advanced by petitioner over a period of years constituted a loan or a contribution to the capital of a corporation. A subsidiary issue is whether an additional sum of $8,813.96 was advanced by petitioner, and, if so, whether such sum constituted a loan or a contribution to capital. [1]
*29 Findings of Fact The petitioner is an individual residing in Forest Hills, New York. He filed his individual Federal income tax return for the year 1941 with the collector of internal revenue for the third district of New York. The petitioner is an attorney and a member of the bar of New York and Pennsylvania. From 1925 until 1939, he was engaged in the practice of law in New York City, specializing in the field of corporation law. In 1939, he resigned from the law firm of which he was a partner and accepted a top executive position in the business organization with which he was associated during the taxable year here involved. Albert Prutzman (hereinafter called Albert), petitioner's brother, is also an attorney and a member of the bar of Pennsylvania and New York. After graduating from law school, he practiced law for a few years in New York City in association with petitioner before returning in the early 1930's to Palmerton, Pennsylvania, where he and petitioner had spent their youth. During the years here involved, Albert was engaged in the practice of law in Lehighton, Pennsylvania. In the summer of 1938, Albert was introduced to Edwin F. Snyder and his son, Kenneth. *30 Edwin F. Snyder, who had been in the slate business all his life, had, for several years prior to 1938, successfully operated under lease the Banner slate quarry at Harpers, Pennsylvania, in partnership with his son. When the lease expired sometime in 1937, the lessor, Kelbright Slate Corporation (hereinafter sometimes referred to as Kelbright) would not renew the lease unless the Snyders agreed to pay increased royalties. The Snyders refused to renew the lease on this basis, and, on December 18, 1937, leased the National slate quarry at Berlinsville, Pennsylvania. The Snyders bought some secondhand equipment and machinery on an installment basis, transferred some of their equipment from the Banner to the National Quarry, drained and removed the debris from the latter and began operations. At this point, Kelbright agreed to renew the lease on the Banner Quarry at the former royalty rate. Thereafter the Snyders were simultaneously operating two quarries. By the summer of 1938, the Snyders were in urgent need of money to meet the installment payments on the newly purchased equipment and to defray general developmental expenses. The Snyders and Albert discussed the matter of obtaining *31 funds to sustain the operation at the National Quarry. Albert told the Snyders that, although he himself had no funds available, he would attempt to persuade the petitioner, his brother, to put up the necessary funds. The Snyders told Albert that approximately $5,000 would be needed. Albert visited the petitioner but was unable to interest him in the proposition. Albert returned and discussed the matter further with the Snyders, who agreed to let Albert, or any one he named, have a one-half interest in the business if he obtained the necessary funds. Albert went to petitioner again and told him that whoever put up the necessary money would receive, at his (Albert's) designation, a one-half interest in the company. He told petitioner that it would take between $3,000 and $7,000 to make the operation profitable. Albert further told petitioner that the Snyders had encumbered machinery and equipment worth at least $7,000. It was understood that a corporation was to be formed. Petitioner agreed to advance the funds necessary for the formation of the corporation. Albert was to participate in supervising the operations and handle the finances of the corporation. It was further understood *32 that the necessary funds, which petitioner thought would probably come to $7,500, would be put up the first year. It was arranged that petitioner would forward by check the required amounts to Albert for deposit either in the latter's personal or his attorney account. Albert would then draw his own check in favor of the corporation as the need for funds arose. Petitioner's advances were to be paid back whenever the operations of the corporation became profitable. On or about August 31, 1938, the E. F. Snyder Slate Corporation (hereinafter sometimes referred to as Slate Corporation) was organized under the laws of Pennsylvania for the purpose of mining and quarrying slate. Albert paid in $510 and was issued 255 shares, or 51 per cent of the capital stock. The Snyders transferred to the new corporation their entire interest in the partnership, together with all their machinery and equipment, in return for which they received 245 shares, or 49 per cent of the stock. Par value of the shares was $1 per share. Paid in surplus was set up as $255. The directors were E. F. Snyder, Kenneth Snyder and Albert. Elected as officers at a meeting held October 1, 1938, were E. F. Snyder, President, *33 and Kenneth Snyder, Secretary and Treasurer. Kenneth Snyder was authorized to open a bank account and to deposit therein monies of the corporation. E. F. Snyder and/or Albert were authorized to draw upon this account. Late in 1938, infavorable slate formations were encountered at the Banner Quarry. Early in 1939, Kelbright agreed to waive back royalties in the amount of $800 and to advance $1,700 in return for the conveyance to it of a portion of the machinery and equipment located at the Banner Quarry. Upon repayment of the $1,700 loan, the machinery and equipment, which in the meantime was to be leased back to the Snyders, would be reconveyed. The purpose of this loan was to finance the removal of surface material or overburden and the exposure of new slate formations suitable for quarrying. In February of 1939, at the instigation of Kelbright, the Rough Texture Slate Corporation (hereinafter called Rough Texture) was organized under the laws of Pennsylvania for the purpose of operating the Banner Quarry. In return for the sum of $800 paid to the Treasurer of Rough Texture, 255 shares were issued to Albert and 245 to the Snyders and their wives. Par value of the shares was $1 *34 per share. The sum of $300 constituted the paid in surplus. Directors, officers and persons authorized to receive deposits and pay out corporate monies were the same as in the E. F. Snyder Slate Corporation. At or about the same time and in conjunction with the above-mentioned loan of $1,700, a new lease was entered into between Kelbright, lessor, and Rough Texture. The removal of the overburden at the Banner Quarry did not uncover satisfactory slate formations. Rough Texture ceased active operations in 1939 or 1940 and transferred all its assets to Slate Corporation. In the fall of 1940, unfavorable slate formations were encountered at the National Quarry. It was decided to remove more overburden and work the slate located thereunder. Albert was advised by experts that the National Quarry contained good slate which would be profitable to quarry. Albert conveyed this information to petitioner, who sent a check to Albert dated October 3, 1940, in the amount of $1,000. Prior to this, on September 25, 1940, the Slate Corporation, at the request of petitioner, issued to petitioner its judgment note for $10,000, payable with interest upon demand. No security for the payment of this *35 note was requested or given. Before the end of the year 1940 petitioner had made two further advances totaling $300. In the summer of 1941, heavy rains caused slides at the National Quarry which covered up that portion of the slate formations which had previously been uncovered by the removal of overburden. Albert requested petitioner to advance money but the latter refused. Albert then got in touch with one Sam Weiman, who loaned the Slate Corporation $3,900, repayment of which was secured by a mortgage dated September 17, 1941, on all the Slate Corporation's machinery and equipment located at the National Quarry. As a condition to the granting of this loan, the lessors of the National Quarry and the petitioner agreed in writing to subordinate their respective claims to the claim of Weiman. The petitioner made his last remittance to Albert by check dated September 22, 1941, in the amount of $500. The Slate Corporation issued to the petitioner its judgment note dated September 25, 1941, in the amount of $5,000, payable with interest upon demand. No security for the payment of this note was asked or given. In the late fall of 1941, the Slate Corporation ran out of funds, ceased *36 operations, and turned over its assets to a trustee for distribution to creditors. The trustee's statement contained the following entry: "Albert Prutzman and Charles Prutzman, Monies advanced to Corporation - $16,000." Petitioner received no money from the trustee upon liquidation of the Slate Corporation. Petitioner never received possession of any Slate Corporation or Rough Texture stock. The Slate Corporation suffered annual operating losses in the following amounts: 1938, $3,112.57; 1939, $3,739.11; 1940, $2,009.94 and 1941 (through 10/31/41) $7,471.30. Rough Texture had not been formally dissolved at the end of 1941. After 1938, the Snyders made no further contribution of cash or property to the corporations. While the corporations were in operation, the Snyders contributed their services on a full time basis. They did not receive regular salaries, merely drawing enough to meet living expenses. The Slate Corporation employed normally between five and ten employees, as did Rough Texture when it was operating. Albert received no salary from the corporation. He contributed his legal services on a part time basis. He visited the quarries frequently and negotiated lease and *37 sales agreements. Petitioner at no time made demand upon the Slate Corporation for payment of the notes issued him. Petitioner received no interest on the notes. Petitioner visited the quarries two or three times. Petitioner's records were kept by his secretary, who listed checks drawn to Albert's order in 1939 under the heading "Loans". In 1940 and 1941, petitioner's secretary listed checks sent to "Albert G. Prutzman a/c Quarry" under the heading "Investment in Slate Quarry". The following table is compiled from the records of petitioner's secretary and lists amounts and dates of checks sent by petitioner to Albert: 1938
1939
1940
1941
$6,000
4/25 $100
1/26 $473
1/6 $250
(estimated)
5/3
150
2/11
900
1/28
150
5/16
150
4/23
600
2/10
700
6/2
300
10/3
1,000
5/21
300
6/16
300
10/5
200
7/18
350
7/3
300
12/13
100
9/22
500 [2]
7/17
300
8/10
600
$3,273
$2,250
9/5
500
9/19
250
11/1
100
12/19
50
$3,100
Petitioner forwarded to Albert *38 for the use of the corporations no amounts in excess of $15,000. Petitioner claimed a bad debt deduction of $15,000 in his Federal income tax return for the year 1941. In the explanatory schedule attached thereto the following appears: "In the Fall of 1938, a proposal was made to taxpayer to lend a small amount of money to the E. F. Snyder Slate Corporation, of Slatington, Pennsylvania, which corporation operated two slate quarries. As an inducement to make this investment, said Corporation offered to give taxpayer one-half of its capital stock, as a bonus. Taxpayer checked into this proposal and found that, with the aid of some capital, this corporation showed great promise of developing into a profitable business; and, therefore, at various times during 1938, 1939, 1940 and 1941, taxpayer loaned to said corporation an aggregate of $15,000, the last of said loans being made on September 22, 1941. * * *
"Also, the agreed bonus of one-half of the corporation's capital stock was placed in escrow for the account of taxpayer." On November 28, 1945, petitioner filed a protest against the proposed assessment of the deficiency here involved which contained the following statement: *39 "* * * In addition, one-half of the amount of the corporation's capital stock was placed in escrow for the account of the taxpayer." On May 23, 1947, a supplemental protest was filed by petitioner in which the following statements appear: "* * * The original amount needed was figured to be a maximum of $5,000 and it was agreed that 51% of the corporations' stock would be given to the lender as a bonus for making the loan. * * *
"[In a footnote] Although a taxpayer was entitled to part of the corporation's stock as a bonus for making the loans, taxpayer never actually received the stock; it was merely held in escrow for him." Respondent disallowed the deduction as a bad debt but allowed one-half of the same as a capital loss. Opinion VAN FOSSAN, Judge: This case turns on the determination of the fact whether the advances by petitioner to or through his brother for the use of the Slate Corporation were loans or were capital contributions. The burden of proof rests on taxpayer and if the evidence does not preponderate in his favor or is left in equipoise, decision must be given against the taxpayer for failure to carry his burden. There is a sharp clash between *40 the oral testimony of witnesses on one hand and various statements attributed to petitioner found in several documents, including petitioner's income tax return and two sworn protests. After carefully considering all such evidence, the inferences to be drawn therefrom and the expositions by counsel, we are unable to hold that petitioner has carried his burden or that the evidence preponderates in petitioner's favor. As a consequence, we have no alternative to giving judgment for the respondent. Decision will be entered for the respondent. Footnotes
1. The record in this case is far from complete, and, in particular, fails to establish consistency between many of the figures appearing herein.↩
2. This check was sent to petitioner's bank in Palmerton, Pennsylvania, to cover amount paid out by it to Albert.↩